## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

```
-------------------------------------------------------------- x
THE OFFICIAL STANFORD INVESTORS          :
COMMITTEE, on its own behalf and as assignee of  :
RALPH S. JANVEY, IN HIS CAPACITY AS COURT-   :
APPOINTED RECEIVER,                       :
                                          :
Plaintiff,                                : Case No. 3:24-CV-02095-N
                                          :
-against-                                 :
                                          :
THE BANK OF NEW YORK MELLON,              :
                                          :
Defendant.                                :
                                          :
                                          :
-------------------------------------------------------------- x
```

Plaintiff, THE OFFICIAL STANFORD INVESTORS COMMITTEE (the "OSIC"), on its own behalf and as assignee of certain claims and causes of action of RALPH S. JANVEY, AS COURT-APPOINTED RECEIVER (the "Receiver") for the various entities that were owned and controlled by R. Allen Stanford (the "Receivership Estate"), as and for its First Amended Complaint against Defendant The Bank of New York Mellon ("BNYM"), alleges as follows:

## I.    INTRODUCTION

1.    The Honorable David C. Godbey, Chief District Judge of the U.S. District Court for the Northern District of Texas, ("Receivership Court") has ordered the Receiver to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants, creditors and investors injured by a massive fraud orchestrated by R. Allen Stanford, James M. Davis, and others. The Receivership Court has formed and recognized OSIC, which is working with the Receiver to investigate and prosecute certain potential claims and causes of action, including the claims asserted in this action. Under the terms of an agreement approved by the

Receivership Court, OSIC has been given primary responsibility for litigating the claims asserted in this action for the benefit of the Receiver and the Receivership Estate.

2.     This is an action by OSIC, which acts as the Receiver's assignee and is also charged with bringing actions on behalf of victims of the fraud at Stanford International Bank, Ltd. ("SIBL" or the "Bank"), part of the Stanford Financial Group ("SFG"),[1] to recover damages from BNYM for aiding and abetting the Stanford fraud.

3.     Stanford collected billions of dollars from unsuspecting victims in the United States, Mexico, Colombia, Peru, Venezuela, and elsewhere in the world. Through a network of sales offices located in those countries, SFG sold purported certificates of deposit ("CDs") issued by SIBL, offering interest rates higher than those generally available at other banks. While SFG'S (including U.S. licensed broker dealer SGC's) financial advisors ("Stanford FAs") convinced the victims that SIBL could offer those higher rates of return because of its unique and successful investment strategy, the operation was a fraud. The Stanford Entities paid outgoing investors with incoming funds; and the balance was squandered on Stanford's lavish lifestyle, or "invested" in entities for which Stanford was the primary owner or beneficiary. As a result, on February 17, 2009, the FINRA broker/dealer solely owned by Stanford, SGC, and solely owned Antiguan bank, SIBL, among other entities, were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws. Investors who purchased CDs issued by SIBL lost $7.2 billion.

4.     The Receivership Court concluded that the Stanford Entities operated as a single

---

[1] Stanford Financial Group or SFG refer to the dozens of affiliated companies owned and/or controlled by R. Allen Stanford ("Stanford"), including but not limited to SIBL, Stanford Group Company ("SGC"), Stanford Capital Management, LLC, Stanford Trust Company Ltd., and Stanford Financial Group Global Management, LLC ("SFGGM"). As used herein, the "Stanford Entities" or "Stanford" refers to these SFG entities together with R. Allen Stanford.

enterprise to perpetrate the massive, worldwide fraud. The Receivership Court also determined that each of the Stanford Entities either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise. In other words, every Stanford Entity, including SGC, Stanford Fiduciary Investor Services ("SFIS"), and SIBL, while under the control and influence of Stanford and his associates, worked in concert with each other and with all other Stanford Entities, as part of the Stanford enterprise, to defraud thousands of innocent people by marketing and/or selling SIBL-issued CDs.

5.      On December 27, 2005, Pershing LLC ("Pershing"), a wholly owned subsidiary of BNYM, entered into a clearing agreement with SGC and together they rendered material assistance to the Stanford fraud from 2005 through February 17, 2009.[2] Among the services that BNYM and Pershing collaborated to provide for Stanford was the transfer of SIBL CD investor funds from those investors' accounts at SGC to SIBL's accounts at the Toronto-Dominion Bank. BNYM effectuated such transfers during the tenure of Stanford's relationship with Pershing. BNYM's assistance was vital to the Stanford fraud, because it was responsible for the transfer of investors' funds into Stanford's pockets. BNYM further aided the fraud by assisting Stanford with recruiting the financial advisors who peddled the fraudulent SIBL CDs to unsuspecting investors and by providing reputational enhancement to Stanford. Indeed, the magnitude of the Stanford fraud would have been impossible to achieve without BNYM's indispensable material aid in growing SGC as described herein, thereby substantially increasing the sales of the SIBL CDs, and

---

[2] Shortly after the Receivership's inception in 2009, the Receiver sought from Pershing certain funds belonging to the Receivership Estate that were held at Pershing and, following receipt of such funds, settled any dispute with Pershing relating to those funds. None of the claims that OSIC asserts against BNYM as assignee of the Receiver in this Original Complaint relates to those events nor does OSIC assert any claims against Pershing. Rather, at issue here are BNYM's actions related to the Stanford Entities, through which it rendered substantial aid and/or support to the Stanford fraud.

effectuating the transfer of investor funds to SIBL. BNYM's assistance facilitated the increase of sales of SIBL CDs from approximately $2.8 billion at the end of 2005 to more than $7.2 billion by the end of 2008.

6.    BNYM, by virtue of its due diligence obligations and efforts in relation to Stanford and his operations, became aware of Stanford's illegal activities as early as mid-2005. BNYM understood that the relationship with SGC would and did entail sending SGC customer funds to SIBL accounts at Toronto-Dominion Bank for the purchase of SIBL CDs and that those transactions would be routed through BNYM. BNYM therefore had a duty to understand the nature and purpose of the wires from SGC to SIBL. Yet, reservations about SIBL, particularly about the composition of SIBL's investment portfolio and its ability to achieve its stated returns, persisted throughout the relationship. Certain personnel who were dual employees of Pershing and BNYM – most notably, Richard Brueckner,[3] George "Tres" Arnett III,[4] and Claire Santaniello[5] – had reservations about Stanford and were involved in multiple meetings and correspondence with Stanford regarding these issues. Nevertheless, despite Stanford's economically unsustainable business model, BNYM's failed due diligence efforts or trips to gain further detail regarding

---

[3] Brueckner, who was CEO of Pershing from 2001-2010, also served as senior executive vice president of BNYM— and so was a dual executive of Pershing and BNYM. As CEO of Pershing, Brueckner reported to Gerald Hassell, then-President of BNYM. Brueckner went on to serve as Chief of Staff at BNYM from October 2011 to September 2015

[4] Arnett, Chairman of Pershing's International Enhanced Due Diligence Committee ("IEDDC"), was also a member of BNYM's "International Reputational Risk Committee ("IRRC"). He was Pershing's In-house Counsel from 2005 through 2009 and reported to Raymond Dorado of BNYM (Executive Vice President and Deputy General Counsel).

[5] Santaniello, Pershing's Global Chief Compliance Officer ("GCCO"), was a member of Pershing's Credit Committee, its Risk Management Steering Committee, the IEDDC, its Suspicious Activity Review and Oversight Committee ("SAROC"), and Pershing's Executive Committee. Santaniello reported to both Pershing and BNYM and was the head of Global Compliance on behalf of both entities.

Stanford's operations, a pending SEC investigation into Stanford, and Stanford's obfuscation in response to reasonable and legally required requests for information, BNYM continued to service the Stanford relationship. These facts, combined with the extended period BNYM allowed Stanford to ignore and simply refuse to respond to its repeated questions, are more than sufficient to support the reasonable inference that BNYM had a "general awareness" of Stanford's underlying wrongdoing.

7.      BNYM's conduct impermissibly put its own financial interests before the interests of SFG and the SIBL CD investors, who suffered foreseeable and substantial losses as a direct and proximate cause of BNYM's conduct. OSIC seeks damages from BNYM for aiding and abetting the Stanford fraudulent scheme and resultant harm to SFG and the Receivership Estate.

## II.    PARTIES

### A.    Plaintiff

8.      By Order dated August 10, 2010, the Receivership Court authorized and approved the formation of OSIC and designated OSIC to generally represent the interests of Stanford investors and, under certain circumstances, to bring and take legal actions for the benefit of the Stanford investors, and on behalf of the Receiver and the Receivership Estate. *See SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N (the "SEC Action") [Doc. No. 1149] (the "Committee Order"). OSIC is an unincorporated association organized under the laws of the State of Texas. As required by the terms of the Committee Order, OSIC is, and has been, cooperating with the Receiver concerning the identification and prosecution of actions under all legal theories for the benefit of the Receivership Estate and Stanford investors. *See id.* at ¶¶ 7, 8. OSIC's membership, and their places of domicile, is as follows: John Little (OSIC Chair, Texas), Ed Snyder (Texas), Judy Blakeway (Texas), Peter Morgenstern (Florida), Jaime Pinto (Peru), and

Pam Reed (Texas).

9.      After the entry of the Committee Order, OSIC and the Receiver entered into a separate agreement and protocol, which outlined the terms by which the Receiver and OSIC would cooperate in litigating claims against third parties in relation to the Stanford fraud (the "Agreement"). *See* Agreement, SEC Action [Doc. 1208]. The Agreement was approved by the Receivership Court in an Order dated February 25, 2010 (the "February Order"). *See* SEC Action [Doc. 1267]. Pursuant to the February Order, OSIC commenced and prosecuted dozens of fraudulent transfer actions against third parties that received illegal transfers from the Stanford Entities, which must be returned to the Receivership Estate for the benefit of Stanford investor/creditors pursuant to TUFTA, as well as other actions involving claims for knowing participation in or aiding and abetting of Stanford's primary wrongdoing. OSIC's actions have all proceeded within the multi-district litigation ("MDL") before the Receivership Court. In the overseeing the MDL, Judge Godbey has affirmed the legal theories underpinning OSIC's claims against BNYM herein in denying motions to dismiss and motions for summary judgment asserted by numerous other third-party aiders and abettors to Stanford's scheme.

10.      Consistent with his authority under Orders of the Receivership Court, the Receiver unconditionally assigned his claims against BNYM to OSIC, and further granted OSIC a power of attorney to pursue claims against BNYM on his behalf, including, without limitation, claims for BNYM's aiding and abetting of Stanford's fraudulent scheme.

11.      This action is prosecuted on behalf of OSIC and the Receivership Estate. Specifically, OSIC herein asserts claims assigned to it by the Receiver on his behalf for the injury SFG suffered because of the Stanford fraud and fiduciary duty breaches and BNYM's aiding and abetting of the same. In an abundance of caution, OSIC further sets forth herein the allegations

and claims to be asserted on behalf of the defrauded SIBL CD investors whose interests OSIC represents in accordance with orders of the Receivership Court and the U.S. Court of Appeals for the Fifth Circuit for harms the investors suffered because of the Stanford fraud and fiduciary duty breaches and BNYM's aiding and abetting of the same. *See Rotstain v. Mendez*, 986 F.3d 931, 935, 941 (5th Cir. 2021). OSIC does so in an abundance of caution to reserve its rights with respect to its claims on behalf of investors, in the event of any holding that its claims against BNYM are time-barred. Such claims remain timely by application of the discovery rule under New Jersey law, as the U.S. Court of Appeals for the Fifth Circuit recently confirmed. *See Mogollon v. Bank of New York Mellon*, No. 21-11212, 2022 WL 17716332, at *5 (5th Cir. Dec. 15, 2022). Nevertheless, OSIC does not waive and indeed expressly reserves its right to claim the benefits of class tolling should this Court deny class certification in the putative class action pending against BNYM, styled *Mogollon, et al. v. Bank of New York Mellon, et al.*, Case No. 3:19-cv-03070-N-BQ (N.D. Tex.).

### B. Defendant

12.    Defendant, The Bank of New York Mellon ("BNYM"), a New York state chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp., a Delaware corporation with headquarters at One Wall Street, New York, NY 10286. BNY Mellon Corp. is the product of the July 1, 2007, merger of The Bank of New York Company, Inc. and Mellon Financial Corporation. BNYM is the successor entity (post-merger) to The Bank of New York. BNYM conducts, and during the relevant period conducted, business at various locations in New Jersey, including Pershing in Florham Park, New Jersey, Pershing LLC in Jersey City, New Jersey, Pershing in Lawrenceville, New Jersey, BNY Mellon Wealth Management in Madison, New Jersey, DPM Mellon in Somerset, New Jersey, and BNY Mellon in Woodland Park, New Jersey.

### III.    <u>VENUE AND JURISDICTION</u>

13.    Jurisdiction is proper pursuant to, 28 U.S.C. §1332(a), because OSIC's citizenship is different from BNYM's and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has jurisdiction over this action, and venue is proper, under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Additionally, venue is proper in the United States District Court in and for the District of New Jersey (1) under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to OSIC's claims occurred in the district, or, alternatively, (2) under 28 U.S.C. § 1391(b)(3) because it is a "judicial district in which [BNYM] is subject to the court's personal jurisdiction with respect to [this] action."

15.    Finally, courts of New Jersey have personal jurisdiction over BNYM because BNYM directed its activities to the forum when it physically visited New Jersey and held multiple meetings with Stanford in New Jersey to engage in recruiting for Stanford, lend reputational enhancement, solicit Stanford's business on behalf of itself and its sister company Pershing, and to review its custody services. BNYM also directed material communications to Pershing in New Jersey regarding its relationships with Stanford, which material communications included due diligence emails, marketing materials, and conference calls. Because OSIC's claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty arise from BNYM's assistance with Stanford's recruiting efforts, reputational enhancements, assistance with transferring funds, and solicitation of Stanford's business—which occurred in New Jersey through in-person meetings and by emails and phone calls to and from the state—BNYM's contacts with the forum are sufficiently related to confer personal jurisdiction over it.

## IV.    FACTUAL ALLEGATIONS[6]

### A.    The Pershing/BNYM-Stanford Relationship

16.    In the first quarter of 2005, Stanford began discussions with BNYM about obtaining clearing services for SGC, services which BNYM's subsidiary Pershing administered. At the time, SGC had been clearing trades with Bear Stearns.

17.    But SGC was looking for more than just a clearing vendor – SGC wanted a new strategic business partner to assist it with its plan for the growth of its network of brokers (who would recommend and sell the CDs). BNYM wanted to be that strategic partner.

18.    The anticipated and desired growth of SGC was the impetus for the relationship with Stanford. At the outset, Stanford wanted and needed the credibility of having a relationship with a firm like BNYM in connection with its plans for significant expansion. As demonstrated below, that credibility, or "reputational enhancement," was critical and was called upon time and time again to recruit financial advisors ("FAs") and grow SGC, and likewise to increase the sale of the SIBL-issued CDs. BNYM was more than willing to give legitimacy to the Stanford enterprise in exchange for SGC's business and securing millions of dollars of revenue each year for itself and its subsidiary Pershing.

---

[6] OSIC did not discover the factual allegations against BNYM until after the plaintiffs in *Mogollon*, Case No. 3:19-CV-3070 (N.D. Tex.), initiated their lawsuit in March 2019, at the earliest. OSIC still does not have access to the documentation that the plaintiffs in *Mogollon* evidently obtained in the summer of 2014 through document production in a private FINRA proceeding against Pershing, which documentation the *Mogollon* plaintiffs allege put them on notice of their claims against BNYM. Nor is OSIC currently privy to the redacted allegations of the *Mogollon* plaintiffs' Amended Complaint or Second Amended Complaint. Case No. 3:19-CV-3070 (N.D. Tex.) (R. Docs. 13, 133). OSIC is aware, however, that the Receivership Court/MDL Court recently held such allegations sufficient to establish jurisdiction, venue, and to state claims against BNYM. Case No. 3:19-CV-3070 (N.D. Tex.) (R. Doc. 78). OSIC therefore incorporates the redacted allegations herein by reference and reserves all rights to amend the instant Complaint to assert the same when the underlying documentation or unredacted allegations are shared with OSIC.

19. Not only was Stanford's relationship with a big name like BNYM critical for recruitment, but Stanford also used the relationship as a selling point directly to investors. For example, on October 6, 2006, R. Allen Stanford sent a letter to investors thanking them for placing their trust in Stanford and touting its new relationship:

> [W]e are pleased to inform you that we have chosen a new strategic clearing provider, Pershing LLC, to service your brokerage account at Stanford Group Company. Pershing is a leading global provider of clearing services consistent with our exacting standards, and is a wholly owned subsidiary of The Bank of New York Company, Inc. I am enclosing *Pershing Facts and Figures* along with *The Bank of New York at a Glance* for your review.

### i. 2005 "Due Diligence" on Stanford

20. Driven by its desire to gain the Stanford business at all costs, BNYM along with Pershing performed due diligence on Stanford beginning in mid-2005, which raised grave concerns and indicia of a fraudulent scheme.

21. BNYM also pitched its services to SGC at this time. Several of the Pershing executives who courted Stanford and engaged in due diligence were also employees of BNYM and simultaneously sought to advance the interests of both BNYM and Pershing. For instance:

- Richard Brueckner, CEO of Pershing from 2001-2010, also served as senior executive vice president of BNYM—a dual Pershing/BNYM executive. As CEO of Pershing, Brueckner reported to Gerald Hassell, then-President of BNYM. Brueckner went on to serve as Chief of Staff at BNYM from October 2011 to September 2015.

- George "Tres" Arnett III, Chairman of Pershing's International Enhanced Due Diligence Committee ("IEDDC"), was also a member of BNYM's "International Reputational Risk Committee ("IRRC"). He was Pershing's In-house Counsel from 2005 through 2009 and reported to Raymond Dorado of BNYM (Executive Vice President and Deputy General Counsel).

- Claire Santaniello, Pershing's Global Chief Compliance Officer ("GCCO"), member of Pershing's Credit Committee, its Risk Management Steering Committee, the IEDDC, its Suspicious Activity Review and Oversight Committee ("SAROC"), and Pershing's Executive Committee. Santaniello reported to both

Pershing and BNYM and was the head of Global Compliance for both BNYM and Pershing.

These and other BNYM/Pershing joint personnel were involved in due diligence of SGC and SIBL for BNYM and met with SGC and SIBL personnel, including on-site due diligence trips in July 2005. From the due diligence, BNYM understood Stanford's stated organizational structure, including Stanford Entities' officers and directors, as well as that SGC received most of its revenue from CD sales of the Antiguan-based SIBL. BNYM understood that the services that SGC sought would require BNYM and its subsidiary Pershing to become involved in sending wires to SIBL for the purchase of SIBL CDs. From the outset, it came face-to-face with the lack of transparency regarding the relationships between and among the Stanford entities, the high rates of return that SIBL was achieving on its investment portfolio, the chummy relationship between Stanford and the Antiguan authorities, Stanford's extensive anti-AML lobbying efforts, recent arbitrations against SGC concerning allegations of fraud and investment unsuitability, and the fact that C.A.S. Hewlett – a tiny unknown firm operating out of Antigua – was the accountant that audited SIBL's multi-billion dollar financials.

22.     BNYM's corporate policies mandated a heightened level of extensive due diligence for Introducing Broker-Dealers ("IBDs") such as SGC, because although SGC was a United States-based NASD/FINRA member firm, it was affiliated with offshore banks, trust companies and broker-dealers with a significant non-US customer base, substantial ownership by a non-US parent, and/or a location in a high-risk jurisdiction. This extensive due diligence was acutely critical to BNYM because in June 2005, BNYM was notified by Stanford's Chief Compliance Officer that the SEC was investigating the sales practices related to the SIBL CDs. Approximately one month after the news of the SEC's investigation into the SIBL CDs, from July 5 through July 8, 2005, Arnett, Santaniello, and their close colleague, Pershing's lead Relationship Manager John

Ward, traveled to SIBL in Antigua to gain an understanding of the bank, its operations, and its investment product – the SIBL CDs. BNYM had an obligation to fully understand SIBL's structure, operations, client base, investment product (the CD) and SIBL's underlying investment portfolio that controlled SIBL's ability to generate the referral fees that sustained SGC. BNYM either willfully refused to understand and document these factors or, upon reaching an understanding, nevertheless decided to proceed with the relationship.

23.     During this July 2005 due diligence visit, Stanford explained that the relationship with BNYM and Pershing was going to entail wiring SIBL clients' funds to facilitate the purchase of the CD product. Beyond BNYM's role enabling the purchase of the CDs, Stanford also discussed the CD product and Stanford/SIBL's investment policy. Stanford represented that SIBL had an 11% return on its investments in 2004, yet Stanford never provided any documentation confirming that number. Likewise, while Stanford talked about SIBL's investment policy regarding allocation of the funds, its statements were not verified by any documentation that showed the specific investments that comprised SIBL's investment portfolio to support Stanford's talking points. Everything that Stanford told BNYM was accepted at face value by BNYM.

24.     Notably, in 2005, BNYM should have exhibited a heightened level of awareness and due diligence into Stanford's operations in light of its agreement "to make sweeping internal reforms to ensure compliance with its antifraud and money-laundering obligations, and be monitored by an independent examiner."[7] That agreement arose from a government investigation that uncovered "systemic failures in BNY's suspicious activity reporting practices and anti-money laundering procedures[, which] … permitted criminal fraud and money laundering activities by

---

[7] *See* United States Department of Justice, News Release, *The Bank of New York Resolves Parallel Criminal Investigations Through Non-prosecution Agreement with the United States* (Nov. 8, 2005), available at https://www.justice.gov/archive/usao/nye/pr/2005/2005nov08.html.

BNY employees and customers to proceed undetected and unchecked for more than a decade."[8] In particular, BNYM had become involved with fraudulent transactions and money laundering in a matter involving Russian and American bank accounts and other fraudulent transactions wherein BNYM's general counsel, managing counsel and other senior executives repeatedly ignored requirements to report illicit transactions until authorities intervened.[9] As a result, BNYM paid $38 million in penalties and victim compensation and agreed to the appointment of the independent examiner, from whom BNYM concealed its concerns about Stanford.

25.     The July 2005 "due diligence" trip to SIBL was merely symbolic – to show that BNYM was going through the appropriate motions to protect itself from future liability. BNYM understood the significance of SIBL by virtue of its relationship with SGC, and the possible consequences associated with the relationship. However, when BNYM and Pershing personnel did not get transparency into SIBL, its CD product or Allen Stanford, and their questions remained unanswered, they were undeterred. With the prospect of substantial revenue driving the decision-making, there was reluctance to jeopardize the prospective new relationship.

26.     Following the July 2005 due diligence trip BNYM knew that SIBL and its CD sales were "the driver in [Stanford's] business model" and that SIBL was SGC's affiliated Antiguan offshore bank and the source of much of its income. Yet, Pershing and BNYM still did not have any answers to critical questions required to determine the legitimacy of the entire Stanford business model.

---

[8] *Id.*
[9] *Id.*; *see* https://www.nytimes.com/2005/11/09/business/bank-settles-us-inquiry-into-money-laundering.html

27.    In September 2005, Pershing and BNYM engaged in the anti-money laundering ("AML") approval process for Stanford, and BNYM actively participated in the AML due diligence process.

28.    During the AML due diligence review, BNYM became aware that R. Allen Stanford had a close, symbiotic relationship with the Antiguan government. In fact, Stanford was the island's largest private sector employer, bought the Antiguan newspaper and was a major source of funding for the entire island. By 2004, the Antiguan government owed Stanford over $87 million, which represented nearly half its annual tax returns, with certain loans secured by the government's tax revenues and medical fund.

29.    During this period, BNYM also became aware of Stanford's business model and, more specifically, the key SGC-SIBL relationship. BNYM/Pershing joint personnel reviewed disclosure statements regarding referral fees paid by SIBL to SGC to promote sales of SIBL CDs, as well as SGC parent company Stanford Group Holdings Inc.'s 2003 and 2004 audited financials. BNYM understood from SIBL annual reports or otherwise through its due diligence efforts that R. Allen Stanford and Davis served as officers and directors of certain SFG entities, including but not limited to SIBL and SGC. Pershing and BNYM's sophisticated employees or professionals likewise understood that, as a result, R. Allen Stanford and Davis owed fiduciary duties to the SFG entities for which they served as officers and/or directors.

30.    BNYM also knew that while its incipient relationship with SGC would not involve directly doing business in Antigua, it would involve doing business with an entity, SGC, that depended for its existence on a relationship with an Antiguan bank, SIBL.

31.    Finally, on December 27, 2005, despite BNYM's awareness of countless signs of highly suspicious activity, its subsidiary Pershing entered into a clearing agreement with SGC,

14

which business relationship contemplated BNYM's critical involvement in transfers of funds from investor accounts at SGC to SIBL. This decision to forge ahead with the relationship was made despite BNYM's knowledge of the following:

- A then-pending SEC investigation into SGC's sales practices relating to the SIBL CD in June 2005;

- R. Allen Stanford's intimate ties with the Antiguan government and his link to corruption in Antigua, including allegations that he bribed Antiguan officials for personal financial gain (Notably, an Antiguan government entity, the Financial Services Regulatory Commission ("FSRC"), was tasked with regulating SIBL);

- R. Allen Stanford's history of owning a bank on the Island of Montserrat, a known haven for money launderers, wherein Stanford forfeited more than $3 million in deposits that were linked to a Mexican drug lord;

- SIBL's historically consistent and remarkably high returns (double-digit returns on its investments for the preceding 15 years) despite fluctuating market conditions;

- SIBL's utilization of a small, one-man accounting firm based in Antigua for its audited financial statements, which was highly unusual for the size and complexity of the Stanford enterprise;

- SGC's negative retained earnings that perpetuated SGC's acute dependence on revenues generated by the 3% referral fees from the sale of SIBL CDs (CD-related referral fees constituted 71.65% of SGC's revenue in 2004 and 63.62% in 2005);

- R. Allen Stanford's continual infusion of cash to maintain the broker/dealer's staggering overhead and consistent losses; and

- Stanford's general lack of transparency regarding source of funds, the construct of SIBL's investment portfolio and R. Allen Stanford's personal financial wherewithal.

32.    BNYM was motivated to partner with Stanford and commence the relationship because of the enormous business growth opportunity that it represented. Throughout the "due diligence" process, BNYM did not concentrate on vetting Stanford, resolving open issues, or ensuring that it and its subsidiary Pershing were entering into a relationship with a legitimate and reputable broker dealer and related entities. Rather, the decision-making was driven by intense

focus upon appropriating the more than $4.5 billion in assets cleared by SGC's previous clearing firm, Bear Stearns, with an additional potential custodial opportunity for BNYM. BNYM therefore focused on how the Stanford relationship would benefit its business.

### ii.    BNYM pitches its services to Stanford.

33.    BNYM and Pershing pitched BNYM's banking services to Stanford. BNYM turned a blind eye to Stanford's misconduct because it was motivated by the desire to provide the operations necessary to further its subsidiary's opportunity to clear $4.5 billion in assets, as well as the opportunity to provide institutional and private wealth custody services to Stanford.

34.    In September 2005, BNYM's Directed Trust Services were pitched to Stanford. Additional BNYM services pitched to Stanford included: Leveraging the BNYM Wealth Management team for private banking products such as lines of credit, standby letters of credit, aircraft loans, unsecured credit, and other lending alternatives; and Securities Based Lending Solutions, including CreditAdvance, a margin lending product, LoanAdvance, a consumer lending product, RealAdvance, a mortgage solution offered by Bank of New York Mortgage Solutions LLC, and Collateral Monitoring Service. Later, in December 2006, Richard Brueckner discussed "the BNY/Mellon deal" with SGC President Danny Bogar of Stanford.

### iii.    Continuing relationship with Stanford

35.    In connection with trying to grow their own businesses, BNYM, along with its subsidiary Pershing, assisted Stanford in attaining its own exponential growth. To help grow SGC, and in turn the sale of SIBL CDs, BNYM actively assisted in recruiting FAs for SGC (a practice that began months prior to even entering a contractual relationship). BNYM knew these FAs would recommend and sell the SIBL CDs to their customers, and that they would enjoy a superior position of knowledge, trust, and confidence in relation to SIBL CD investors. Because Stanford, however,

was not well known to FAs with large books of business at the top broker-dealers around the country, BNYM lent irreplaceable "reputational enhancement" to the Stanford enterprise by promoting the BNYM/Pershing partnership with SGC. This was referred to internally as "selling the Pershing face" or "delivering the whole firm" – *i.e.*, Pershing and BNYM. The use of such reputational enhancement was successful, as FA recruits were very impressed with Stanford and its partnership with the BNYM financial behemoth. In addition to prospecting financial advisors for SGC by touting the partnership with BNYM and Pershing, new recruits and existing FAs were assured that Stanford had been through a rigorous institutional vetting process involving BNYM/Pershing joint personnel to eliminate any apprehension that the FAs had about recommending the SIBL CD product to their clients. The true nature of the vetting process, which was riddled with doubts and concerns, was hidden from the FAs.

36.    In addition to recruiting and reputational enhancement, BNYM assisted in the transfer of funds to Stanford entities including SIBL. BNYM provided wire services to SGC and was under a regulatory obligation to monitor the flow of funds to SIBL. BNYM's AMLOC, or Anti-Money Laundering Oversight Committee, was responsible for monitoring the flow of funds between a U.S. Brokerage firm (SGC) wiring funds to an offshore bank (SIBL) when SGC processed the transaction on the BNYM banking system. Pershing has admitted that between 2006 and 2009, it participated in over 1,600 transactions totaling over $500 million in the transfer of investor funds to SIBL for the purchase of SIBL CDs. Upon information and belief, a substantial portion of this sum was processed through BNYM.

37.    Throughout 2006, BNYM continued to provide unabated assistance to Stanford. All the while, BNYM, along with Pershing, revisited the critical questions from the 2005 "due diligence" that were never answered. In mid-2006, when Pershing's newly hired Director of Credit

Risk Management Richard Closs was tasked with a "re-review" of Stanford, Stanford's refusal to provide transparency quickly resurfaced. Closs's independent review was intended to "identify and verify" the source of funds that were supporting SGC in the form of referral fees. Closs examined SGC's focus reports and SGC's financial statements and became concerned that:

- SGC was losing approximately $2-3 million per quarter;

- Approximately two-thirds of SGC's income was referral fee income from the SIBL CD sales (in Closs's 30 years of experience in credit risk, he had never seen a situation like the Stanford entities – where more than 50% of a U.S. based broker dealers' revenue was being generated from an affiliated offshore bank product);

- BNYM/Pershing's joint due diligence had not collected any information to confirm the profitability of the Stanford enterprise , specifically considering SIBL's at least 12% hurdle rate for profitability (sum of the approximately 6% interest rate being paid plus the 3% commission and 3% overhead);

- BNYM/Pershing's joint due diligence did not yield any transparency into SIBL's underlying investment portfolio; and

- BNYM/Pershing's joint due diligence did not yield transparency into Allen Stanford's financial wherewithal, despite his capital contributions.

BNYM was directly involved in this 2006 "re-review" via its head of Global Compliance, Santaniello. The relationship proceeded even though BNYM never documented any satisfactory answers to these critical concerns and questions.

38.     BNYM became aware that in mid 2007, Pershing personnel met with Stanford representatives, including Davis, to discuss the relationship. The agenda for the meeting included:

> Relationship Review (How are we doing?)
> Stanford Group Company Strategic Plan
> Pershing/BNY Mellon Strategic Review
> Stanford Financial Group/Stanford Group Company Financials
> Stanford International Bank – Discussion of CD Product, Management of Portfolio, asset allocation, expenses, referral fees paid to SGC, and projections relating to portfolio growth and any plans to diversify revenue stream

Following up on the meeting, documentation was requested regarding the SIBL portfolio, including the "Investment Policy Statement . . . Details of external managers utilized to manage the SIBL portfolio Statements from your custodian(s) reflecting asset totals maintained in custody (do not need position details – perhaps 10 largest positions globally)," "Audited financials and statement from BDO Seidman," and "Financial statement (when available) for Mr. Stanford." In response, Stanford proposed that they instead "call some of our advisors" and offered to provide SIBL's "investment philosophy document." BNYM/Pershing joint personnel and Stanford held a subsequent meeting that included BNYM executive Brueckner where they accepted Stanford's desire that the due diligence rely principally on conversations with those advisors.

39.    Then, in October 2007, in response to BNYM's further requests to gain transparency into SIBL, Stanford suggested that the "Antiguan secrecy laws" mandated that any review of the SIBL portfolio would require an in-person visit to Antigua. Even though SIBL and its portfolio were managed out of Memphis, Tennessee – not Antigua – this false information from Stanford was taken at face value without even checking or researching the claim of Antiguan bank secrecy, which only applied to protect bank customer information – not SIBL's underlying investment portfolio.

40.    As a result, in or around December 2007 a joint BNYM/Pershing due diligence team was formed, which included Richard Closs, George Arnett, and John Ward ("Due Diligence Team"). This Due Diligence Team's effort was conducted with input from executives at both BNYM and Pershing since both entities were operationally involved in the relationship with Stanford. In January 2008, the Due Diligence Team traveled to SIBL in Antigua to meet with the financial regulators of Antigua (the FSRC) and SIBL's external auditor (one-person accounting firm), review the work papers and audit of SIBL, and to review and reconcile the custodian

statements for SIBL's investment portfolio. This trip, however, was destined for failure before it even began.

41.     As Close waited to board the plane to Antigua, Arnett and Ward informed him that the external auditor was not going to be present in Antigua. Once in Antigua, Arnett, Close, and Ward met with Danny Bogar, the president of SGC. When they asked Stanford to see the statements that they came to Antigua for, they were told that Stanford decided not to give them over for review, claiming that the Antiguan bank secrecy laws would not allow them to.

42.     Despite his purported expertise in money laundering laws (which are intended to protect the customer, not the bank), Arnett did not ask to see a copy of the Antiguan bank secrecy law, nor did he confirm the applicability or even the existence of the law.

43.     Ultimately, the Due Diligence Team was not allowed to review SIBL's investment statements and reports and thus was unable to reconcile SIBL's claimed assets. Internal memoranda reflect "mixed results" from this trip and indicate that Frank LaSalla and Ward had a call with Bogar of Stanford "to express [their] disappointment with the outcome of the Antigua visit" and "stressed the need to resolve" this outstanding issue. The Due Diligence Team described this trip as "extremely disappointing" because "we were not going to get access to the information that we thought we were going to get access to and the reason we made the trip." Thus, the Due Diligence Team knew that the FSRC did not audit or verify the SIBL CD portfolio, but rather the FSRC merely obtained statements from SIBL.

44.     In short, that both BNYM and Pershing continued the relationship with Stanford at this point is yet another clear indicator of the willingness to participate in and become complicit in Stanford's misconduct. The Due Diligence Team, and by extension BNYM, accepted every excuse that Stanford made because it simply did not want to have to address what it already knew

to be true. The Due Diligence Team also took the FSRC's representations as true, despite its knowledge that R. Allen Stanford had intimate government ties and had been accused of bribing government officials in Antigua (which turned out to be true in the case of Leroy King of the FSRC who is now serving a ten-year prison sentence after pleading guilty to one count of obstruction of justice for his role in obstructing the Securities and Exchange Commission investigation into Stanford and SIBL).

45.     Rather than terminate the relationship, the Due Diligence Team incredibly agreed to give Stanford "another chance" and requested an independent audit of SIBL upon its return from Antigua. While waiting for Stanford to agree to this proposal, news broke in July 2008 that Stanford was under continued investigation by the SEC for SGC's sales of the SIBL CDs. This investigation was based on allegations made by two former SGC employees, that included SGC's failure to file forms with the U.S. Treasury Department, purging files and destroying documents related to an ongoing SEC investigation into the CD sales practices and providing false historical performance data for its securities. Of course, BNYM knew since 2005 that the SEC had been investigating Stanford, but this news in July 2008 added fuel to the fire.

46.     In August 2008, Arnett, one of the joint BNYM/Pershing executives, filed the first of at least two incident reports relating to Stanford. This incident report regarding SIBL was based on information from a BNYM executive (during the period when Pershing and BNYM were wiring funds for SIBL) and stated in part, "[f]or some time, Pershing has been concerned" [about Stanford]. Despite the incident report's reference to "for some time," that awareness that BNYM was treading on dangerous ground by doing business with Stanford dated back all the way to the joint BNYM/Pershing due diligence efforts in 2005.

47.    In November 2008, BNYM learned that Stanford was not going to agree to an independent audit of SIBL, citing more pressing matters. Stanford's change of course regarding the independent audit is consistent with the game of "stall, delay and obfuscate" that BNYM had permitted Stanford to play without consequence since 2005 in connection with not providing information on SIBL's investment portfolio and R. Allen Stanford's personal financial statements. While Stanford consistently broke its "promises" to provide critical information to BNYM since 2005, BNYM, along with its subsidiary Pershing, chose to remain Stanford's strategic partners.

48.    In December 2008, in connection with a review of SGC and SIBL, BNYM and Pershing Executives, including Arnett, drafted an internal memorandum (which would ultimately be reviewed by the highest level of management at BNYM) and listed the following issues to be aware of:

1)  Unprofitability of SGC, reliant on steady stream of capital contribution;

2)  SGC heavily dependent on referral fees from SIBL;

3)  SGC has entered into long-term contracts with HNW [high net worth] brokers so inability to attract customers to SGC (because of problems at SIBL or lack of capital contributions or decreased referral fees) will impact profitability of SGC;

4)  Poor performance of SIBL could have negative impact on SGC; SIBL must obtain a high investment yield on invested assets given cost of paying interest on CDs and paying referral fees to SGC and other costs;

5)  SIBL is based in a Tier Two country; and

6)  Auditor of SIBL is a small local provider.

The memorandum further noted "concerns relative to the continued ability of Allen Stanford to fund the BD [SGC]," considering the single shareholder structure.

49.    As a result, members of the Due Diligence Team, along with other BNYM and Pershing personnel, held two meetings in New Jersey to discuss the Stanford relationship. The first

meeting, on or about December 10, 2008, was to discuss the range of available options including 1) do nothing; 2) terminate the process of wiring funds to SIBL for the purchase of CDs; or 3) terminate the relationship with Stanford in its entirety. Certain personnel wanted to terminate and sever the relationship with Stanford due to all the significant concerns about Stanford's lack of transparency. Alternatively, Pershing's then-COO Brian Shea[10] proposed merely to terminate sending the wires to SIBL. Ultimately, in the second meeting on or about December 12, 2008, following the arrest of Bernie Madoff, the latter course was chosen to stop only the wires to SIBL and not completely terminate the relationship, despite open speculation at this meeting about the possibility that Stanford could be a fraud just like Madoff. Basically, the only way BNYM personnel would have agreed to terminate the relationship with Stanford would have been if R. Allen Stanford openly admitted to engaging in a fraudulent scheme. Of course, the millions of dollars of revenue that the overall relationship with Stanford produced was a driving factor in the decision-making.

50.    That same day, a Senior Executive in the Relationship Management department (Tom Meder) emailed Closs asking: "You think there'll [sic] be any more like this [Madoff]?" Closs responded, "Hmmmmm....let me see, high profile name, money manager, large asset manager...Allen Stanford???" Three minutes later, Mr. Meder replied, "Bingo!!!!!!"

51.    After BNYM/Pershing informed Stanford of the decision to cease the processing of third-party wires to SIBL, Stanford immediately requested and received a one-week extension to implement the new policy. The extension was not limited to one week; Stanford was permitted to continue to wire investor funds to SIBL until January 12, 2009.

---

[10] Brian Shea was the COO of Pershing from 2001-2010. He subsequently served as the President of Investment Services at BNYM and then Vice Chairman and CEO of Investment Services at BNYM. While at Pershing, Shea reported to Gerald Hassell, then-President of BNYM.

52.     Nonetheless, at this same time BNYM/Pershing joint personnel were involved in the internal decision to address the issue of repricing the clearing agreement with Stanford to provide lower fees and charges. Previously, in the first quarter of 2008 Stanford had requested a re-pricing to reflect its growth and other factors. However, on May 19, 2008, Ward notified Stanford that while the issues with SIBL were still unresolved, repricing discussions between Stanford and BNYM/Pershing personnel would be tabled. Yet, in 2009, BNYM became aware of indications that SGC was looking for a new clearing firm or to become self-clearing. In the end, despite not gaining any transparency into SIBL since the first quarter of 2008 and considering the decision taken by BNYM and Pershing to maintain the Stanford account and the revenue it produced, Stanford was nonetheless offered price reductions and a contract extension. BNYM was aware that the Relationship Management team communicated this decision – the "true WIN/WIN proposition" – to Stanford on February 2, 2009.

53.     On February 3, 2009, two weeks prior to the SEC's raid and shutdown of Stanford, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement, and Investigations Unit, emailed Arnett:

> I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC[11] last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better ***understand what triggered our concerns in 2008***. Finally they asked ***whether any extra monitoring was being done on the questionable CD rates***. (emphasis supplied).

54.     Although McCullough mistakenly believed that the concerns only dated back to the Due Diligence Team's efforts in January 2008 (such concerns regarding Stanford's lack of

---

[11] Upon information and belief, "SIOC" is the acronym for BNYM's Sensitive Issues Oversight Committee.

transparency and questionable CD rates date back to 2005), this email essentially admits that the Due Diligence Team had let its discoveries about Stanford and accompanying concerns fester like an open sore, facilitating the Stanford fraud's growth in the process. It further underscores BNYM's knowledge regarding the due diligence concerns, the deliberations regarding whether and/or how to continue with the Stanford relationship given those due diligence issues, and the concerns that Stanford could be another Madoff, discussed above.

55.    In short, despite everything that occurred, the only obstacle that stopped BNYM from continuing its association with Stanford was the February 17, 2009 raid of Stanford's headquarters by federal authorities that shut down the Stanford scheme. By then, it was already too late for thousands of victims of this massive fraudulent scheme.

56.    Ultimately, in the three years of BNYM's significant role and substantial assistance, SIBL CD deposits increased from $2.8 billion to more than $7.2 billion. BNYM had the ability to thwart the most successful years of Stanford's scheme by stopping it in 2005, but instead it chose its business interests at the expense of thousands of innocent victims.

## V.    RELIEF REQUESTED

57.    For each of the following causes of action, OSIC incorporates by reference and reasserts the allegations above as if fully set forth below in conjunction with each Count.

**COUNT I**
**Aiding and Abetting Fraud**
*On behalf of the Receivership Estate[12]*

58.    BNYM aided and abetted the Stanford fraudulent scheme that defrauded SFG as well as the tens of thousands of SIBL CD investors whose interests the Committee represents. The

---

[12] OSIC reserves its right to assert the claim for aiding and abetting fraud on behalf of the defrauded SIBL CD investors whose interests it represents for their losses based upon the allegations of the Complaint and the claim asserted in Count I.

Committee asserts this Count as assignee of the Receiver for losses incurred by the Receivership Estate.

59.    BNYM possessed a general awareness of Stanford's underlying fraud. BNYM worked with Stanford despite everything it learned about Stanford that demonstrated it was not a legitimate enterprise, such as SGC's unprofitability and resultant reliance upon capital contributions and referral fees, a lack of documentation supporting SIBL's unusually high return on investments and R. Allen Stanford's purported wealth, the failed due diligence trip to Antigua to understand Stanford's operations, a pending SEC investigation into Stanford, the reporting on Allen Stanford's regulatory capture of Antiguan regulators, the high risk jurisdiction out of which SIBL operated, and Stanford's general lack of transparency. As a result of the foregoing and other indicia, multiple BNYM employees were gravely concerned about the Stanford relationship going back to 2005. This concern is underscored by the August 2008 incident report, which originated from a BNYM executive.

60.    Furthermore, BNYM's atypical conduct with respect to Stanford gives rise to a reasonable inference of knowledge:

- BNYM facilitated the sale of SIBL CDs (*e.g.*, fund transfer requests wherein BNYM is the intermediary bank for funds wired to SIBL);

- BNYM's due diligence revealed the illegality of the scheme and provided BNYM with actual knowledge of the fraud;

- On February 3, 2009, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement, and Investigations Unit, emailed Arnett: "I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better understand what triggered our concerns in 2008. Finally they asked whether any extra monitoring was being done on the questionable CD rates"; and

- BNYM engaged in recruiting for Stanford.

26

61.     BNYM further encouraged and/or provided substantial assistance to the Stanford scheme based on 1) BNYM's involvement in recruiting Stanford FAs; 2) BNYM's provision of reputational enhancement; 3) BNYM's involvement in the transfer of funds to Stanford; and 4) BNYM's solicitation of Stanford's business.

62.     The substantial assistance provided by BNYM gave a false sense of legitimacy to Stanford's illicit activities which allowed R. Allen Stanford and his associates to defraud SFG and the SIBL CD investors.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
*On behalf of the Receivership Estate[13]*

63.     BNYM aided and abetted and participated in R. Allen Stanford's and Davis's breaches of fiduciary duty owed to SIBL, SGC, and other SFG entities. The Committee asserts this Count as assignee of the Receiver for losses incurred by SFG/the Receivership Estate because of R. Allen Stanford's and Davis's fiduciary duty breaches and BNYM's aiding and abetting of the same.

64.     R. Allen Stanford, Davis, and the officers and directors of the Stanford Entities were fiduciaries to SIBL, SGC, and other SFG entities during the relevant period, and by engaging

---

[13] OSIC reserves its rights to assert a claim for aiding and abetting the breach of fiduciary duty on behalf of the defrauded SIBL CD investors whose interests it represents. A fiduciary relationship existed between the Stanford Entities, including but not limited to SGC, and victims of the scheme who purchased SIBL CDs. A fiduciary relationship likewise existed between the Stanford FAs and SIBL CD investors. Stanford FAs were in a superior position of knowledge, trust, and confidence and as such, their obligations to SIBL CD investors included a duty of loyalty and duty to exercise reasonable skill and care. BNYM was aware of these fiduciary duties through its understanding of the Stanford business model as that model was represented to investors. It was further aware of the Stanford FAs' role in facilitating sales of SIBL CDs to investors. Based on these allegations, and those components of BNYM's knowledge and substantial assistance asserted in this Count II, OSIC possesses a claim against BNYM for aiding and abetting breach of fiduciary duty on behalf of the defrauded SIBL CD investors.

in the illegal Stanford fraudulent scheme and in directing the SFG entities to violate U.S. securities and banking laws, they breached those fiduciary duties.

65.    BNYM possessed a general awareness of R. Allen Stanford and other officers and directors of the Stanford Entities' breaches of fiduciary duty by engaging in a fraudulent scheme and by causing the SFG entities to violate U.S. laws and regulations. BNYM knew that R. Allen Stanford and other officers and directors of the Stanford Entities owed fiduciary duties to SIBL and the Stanford Entities. It was aware of these fiduciary duties through its understanding of the Stanford business model, gained through its review of the SIBL annual report and/or other due diligence efforts. BNYM knew that SIBL CD investors purchased SIBL CDs with the expectation of receiving a return on that investment and that SIBL was to use the money that was invested in its CDs consistent with SIBL's purported business and investment model. Yet, BNYM understood that this expectation could not and did not match with reality based on numerous factors, including but not limited to SGC's unprofitability and resultant reliance upon capital contribution and referral fees, the lack of documentation Stanford could provide regarding its unusually high return on investments and R. Allen Stanford's purported wealth, BNYM's due diligence trip to Antigua through which it was unable to chart an understanding of Stanford's operations, its knowledge of a pending SEC investigation into Stanford, and Stanford's general lack of transparency despite numerous requests for information. As a result, multiple BNYM employees raised the alarm about Stanford, but BNYM nevertheless continued to provide substantial assistance to Stanford.

66.    BNYM knew or became generally aware of the actions described herein that constituted breaches of fiduciary duty by R. Allen Stanford, Davis, and other co-conspirators. OSIC's allegations herein regarding BNYM's atypical conduct with respect to Stanford give rise to a reasonable inference of knowledge:

- BNYM facilitated the sale of SIBL CDs (*e.g.*, fund transfers wherein BNYM is the intermediary bank for funds wired to SIBL);

- BNYM's due diligence revealed the illegality of the scheme and provided BNYM with actual knowledge of the fraud;

- On February 3, 2009, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement, and Investigations Unit, emailed Arnett: "I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better understand what triggered our concerns in 2008. Finally they asked whether any extra monitoring was being done on the questionable CD rates"; and

- BNYM engaged in recruiting for Stanford.

67.     Despite such knowledge and/or awareness, BNYM encouraged and/or provided substantial assistance to the Stanford scheme based on 1) BNYM's involvement in recruiting Stanford FAs; 2) BNYM's provision of reputational enhancement; 3) BNYM's involvement in the transfer of funds to Stanford; and 4) BNYM's solicitation of Stanford's business. Additionally, Arnett, who considered himself to be an authority or expert regarding legal issues pertaining to anti-money laundering in high-risk jurisdictions, accepted Stanford's baseless claims regarding "Antiguan secrecy laws" as a justification for Stanford not providing critical information to BNYM/Pershing.

68.     The substantial assistance provided by BNYM gave a false sense of legitimacy to Stanford's illicit activities which allowed R. Allen Stanford and his associates to continue to breach their fiduciary duties to SIBL, SGC, and other SFG entities, resulting in massive liability damages to said entities.

69.     By its conduct described herein, BNYM aided and abetted the breaches of fiduciary duty of Stanford, Davis, and other co-conspirators. BNYM's actions, on their own and in combination with the actions of R. Allen Stanford, Davis, and other co-conspirators are a

proximate cause of actual damages to SIBL, SGC, and other SFG entities, and therefore the Receivership Estate.

WHEREFORE, OSIC, on the Receiver's behalf, requests that the Court enter judgment against the Bank of New York Mellon which:

1.    Awards to OSIC compensatory, actual, punitive, and other damages, including interest thereon, in an amount to be proven at trial;

2.    Awards pre-judgment and post-judgment interest, as provided by law; and

3.    Awards such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

OSIC demands a trial by jury on all issues so triable as a matter of right on all counts in this Complaint.

**FISHMAN HAYGOOD, L.L.P.**

Dated: October 14, 2024               */s/ Benjamin D. Reichard*

James R. Swanson (*PHV*)
Benjamin D. Reichard
Molly L. Wells (*PHV*)
C. Hogan Paschal (*PHV*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

**EDWARD SNYDER ATTORNEY AT LAW PLLC**
Edward C. Snyder
Lincoln Center
7800 West Interstate 10, Suite 605
San Antonio, Texas 78230
Telephone: (210) 630-4200
Facsimile: (210) 630-4210
esnyder@casnlaw.com

*Attorneys for Plaintiff*

## LOCAL CIVIL RULE 3.3 NOTICE

Pursuant to Local Civil Rule 3.3, I hereby notify the Court that the matter in controversy is related to the matter styled *Mogollon, et al. v. Bank of New York Mellon, et al*, which, like this matter, was originally filed before the U.S. District Court for the District of New Jersey and assigned Case No. 3:19-cv-08235 and was transferred by order of the JPML Panel to the United States District Court for the Northern District of Texas, where it is pending under Case No. 3:19-cv-03070 .

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**FISHMAN HAYGOOD, L.L.P.**

Dated: October 14, 2024

*/s/ Benjamin D. Reichard*
James R. Swanson (*PHV*)
Benjamin D. Reichard
Molly L. Wells (*PHV*)
C. Hogan Paschal (*PHV*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

**EDWARD SNYDER ATTORNEY AT LAW PLLC**
Edward C. Snyder
Lincoln Center
7800 West Interstate 10, Suite 605
San Antonio, Texas 78230
Telephone: (210) 630-4200
Facsimile: (210) 630-4210
esnyder@casnlaw.com

*Attorneys for Plaintiff*